811 A.2d 389

CHESTNUT REAL ESTATE PARTNERSHIP, et al.

v.

Erwin W. HUBER, et al.

No. 1592, Sept. Term, 2001.

Court of Special Appeals of Maryland.

Nov. 27, 2002.

Benjamin Rosenberg (Lynn E. Ricciardella and Rosenberg, Proutt, Funk & Greenberg, LLP of Baltimore, and John H. Zink, III, Patricia A. Malone and Venable, Baetjer and Howard, LLP of Towson, on the brief), for appellants.

Glenn E. Bushel (Brocato, Price & Bushel, P.A., on the brief), Baltimore, for appellees.

Argued before JAMES R. EYLER, ADKINS and MARVIN H. SMITH (Retired, Specially Assigned) JJ.

SMITH, Judge.

This case involves a tug-of-war between the owners and developers of the Blakehurst Life Care Community, the appellants, and representatives of its neighbors, members of a neighborhood Advisory Board, the appellees. Presently, the parties quarrel over the manner in which appellants intend to improve the Blakehurst property, and the equitable remedies fashioned by the circuit court to resolve their dispute.

Appellants [1] seek our review of two orders of the Circuit Court for Baltimore County dated August 28 and November 29, 2001, respectively. In the former, the circuit court granted injunctive relief directing Chestnut to remove a garden shed and awarding attorney's fees. By its latter order, the court enjoined the construction of additional parking spaces, and awarded counsel fees to appellees with respect to the subject of the November Order. For the reasons set forth below, we shall affirm the circuit court in all respects, and remand for the circuit court to render findings of fact and conclusions of law with respect to additional attorneys' fees and costs.

---

1. The appellants in this action, defendants below, are the Chestnut Real Estate Partnership, West Joppa Road Limited Partnership, Continental Care, Inc., Chestnut Village, Inc., Rosedale Care, Inc. and Mullan Development, Inc. They will be referred to collectively as appellants or Chestnut. Appellees are the neighborhood Advisory Board, which was created pursuant to Section 432.3F of the Baltimore County Zoning regulations, and certain individuals. We will note them as the Advisory Board or appellees.

### Background

There have been two separate and distinct appeals involving these parties in this Court. The first action arises out of a 1999 proposal by Chestnut to create a total of 63 additional parking spaces at the Blakehurst Life Care Community. This move was vigorously opposed by neighbors and their Advisory Board. Baltimore County zoning administrators initially approved the request. On appeal by the Advisory Board, the Baltimore County Board of Appeals reversed, and disapproved Chestnut's proposal.

In the ensuing action for judicial review of this decision, Judge Wright, in the Circuit Court for Baltimore County, affirmed the Board's decision. On appeal to this Court by the developer and owner of Blakehurst, we upheld the circuit court. *Blakehurst Life Care Community/The Chestnut Real Estate Partnership v. Baltimore County* 146 Md.App. 509, 807 A.2d 179 (2002) (*Blakehurst I* ). Writing for this Court, Judge Sharer reviewed in detail the factual and procedural history of the restrictive covenant Agreement executed by these parties:

> Blakehurst Life Care Community is a 278–unit continuing care/assisted living community located on Joppa Road in Towson, Baltimore County. It was developed by the Chestnut Partnership in 1988.
>
> Because there was, at that time, opposition from the neighboring community (represented primarily by the Ruxton–Riderwood–Lake Roland Area Improvement Association) (the Association) in which the development was planned, there evolved a restrictive covenant agreement (the Agreement) which allowed the initial development to go forward. The Agreement was adopted by the appropriate Baltimore County agencies as the operative controlling document for the development of Blakehurst, and for future expansions and improvements.
>
> * * *
>
> In 1988, the Chestnut Partnership submitted to the Baltimore County Review Group (CRG) a plan to build a continu-

ing care facility on a 40.92 acre tract at 1055 Joppa Road in Towson. On September 8, 1988, following a public meeting, the CRG approved the plan. Adjacent property owners and the Association filed an appeal of the CRG approval to the Baltimore County Board of Appeals.

The Chestnut Partnership then filed petitions for a special exception and variance with the Baltimore County Zoning Commissioner. Following a hearing on September 25, 1988, the Zoning Commissioner denied the requests ruling that "... the size and scope of the project is inconsistent with the peaceful use and enjoyment of the surrounding neighborhood." The Chestnut Partnership filed a timely appeal of that decision to the Board.

To avoid further administrative litigation, and probable appeals, relating to the proposed development, the Chestnut Partnership, the Association, and several individual adjacent property owners entered into the Restrictive Covenant Agreement. The Agreement, executed on October 13, 1988, stipulated that specifically identified maps, plans, plats, and other pertinent documents, would define the size and scope of the Blakehurst development (1) for 25 years on the portion of the land containing the residential buildings and (2) for 50 years on the remaining portion of the land.

The Chestnut Partnership, the Association and the individual parties to the Agreement then requested that the Board consolidate the pending appeals (the CRG approval appeal and the special exception denial appeal) and to approve the development in the terms defined by the Agreement. The Board acquiesced and, on October 25, 1988, entered a consent order adopting and incorporating the Agreement. The consent order provided, in relevant part, that

> The Continuing Care Facility hereby approved shall conform in all respects to the terms and conditions of the October 13, 1988 Restrictive Covenant Agreement and Exhibits between the parties, which is hereby incorporated as a part of this Order as if it were fully set forth herein.

Blakehurst was then developed and constructed by the Chestnut Partnership.

*Blakehurst I,* 146 Md.App. at 512–13, 807 A.2d at 181. We shall briefly revisit the administrative review proceedings as necessary for our discussion of the instant appeal.

In addition to being enrolled as an order of the Board of Appeals, the parties' restrictive covenant Agreement was also duly recorded in the Baltimore County land records on March 24, 1992. It has been amended by five separate addenda since the parties reached their accord in 1988. In 1996, Chestnut approached the Advisory Board with proposals for more parking and other additions. The Advisory Board approved these requests, which were then embodied in the fourth and fifth addenda to the Agreement. For the 1999 parking proposals, however, Chestnut did not avail itself of this procedure. The Advisory Board and its members objected. The resulting conflict was resolved, as we have seen, by administrative litigation and the ensuing actions for judicial review.

The proposed extension of the parking was not the only point over which the parties disagreed. On February 29, and June 21, 2000, the Advisory Board, through counsel, contacted representatives of Chestnut and objected to the construction of a garden shed, the presence of two other structures, and other apparent changes to the Blakehurst landscape not relevant here. The Advisory Board sought the removal of the offending structures and other action.

The parties reached an impasse. Appellees then filed this action in the Circuit Court for Baltimore County seeking to enforce the Agreement. They prayed for injunctive relief which would require the dismantling of the offending structure. They also requested a declaration that the Agreement was enforceable. In addition, they sought attorney's fees under Paragraph 18, the enforcement provision of the Agreement.

Following a lengthy bench trial, the circuit court (Cahill, J.) ruled in favor of the Advisory Board. In its August 23, 2001 judgment order, the court granted injunctive and declaratory

relief. It ordered the dismantling of a metal equipment/tool shed structure and foundation, which was located south of Cemetery Road, and the garden shed that had been erected during 1999–2000, including its foundation. It declared the restrictive covenant Agreement to be enforceable by appellees. The circuit court also awarded $27,147.85 in attorneys' fees and costs.

Following this order, Judge Wright issued his order in the related judicial review action, affirming the decision of the Board of Appeals. That order was affirmed by this Court in *Blakehurst I*. Armed with Judge Wright's decision, the Advisory Board on September 14, 2001, moved for partial summary judgment on the remaining issues in the injunctive action in the case *sub judice*. On November 29, 2001, Judge Cahill enjoined Chestnut from using certain existing parking spaces, and prevented additional parking. The court awarded additional attorneys' fees in conjunction with this second stage of the action.

This timely appeal followed.

### Discussion

Appellants raise four issues in this appeal, which we have recast somewhat:

I. Whether the Circuit Court erred in holding that the construction of the garden shed violates Paragraph 2.b of the Restrictive Covenant Agreement?

II. Whether the Circuit Court abused its discretion in granting mandatory injunctive relief without a finding of irreparable harm?

III. Whether the Circuit Court erred in holding that the Agreement required an Addendum before Blakehurst could construct additional parking spaces?

IV. Whether the Circuit Court's award of attorneys' fees can be upheld?

We hold that the Agreement prohibits the construction of a garden shed such as the structure at issue. We also conclude that, under the extant circumstances, a mandatory injunction

may issue to prevent violations of the restrictive covenant Agreement without a corresponding explicit showing of irreparable harm. We also see no error in the circuit court's holding with respect to the additional parking; this issue is precluded by this Court's decision in *Blakehurst I*. In view of our holdings on these issues, we uphold the circuit court's awards of attorneys' fees. Therefore, we shall affirm the circuit court in all respects.

## I.

At the outset, we shall briefly consider our jurisdiction over this appeal, a matter which we may address *ex mero motu,* because the unique circumstances of this case prompt us to consider whether the parties are bound to exhaust available administrative remedies. *See Moats v. City of Hagerstown,* 324 Md. 519, 525–26, 597 A.2d 972, 975 (1991). We address this, because while parties could seek the assistance of a court in equity to enforce contracts, particularly restrictive covenants, *see, e.g., Eisenstadt v. Barron,* 252 Md. 358, 250 A.2d 85 (1969), the restrictive covenant Agreement in this case has also been incorporated into an order of the Baltimore County Board of Appeals, and "became enforceable by the Board." *Blakehurst I,* 146 Md.App. at 520, 807 A.2d at 186. The threshold question thus becomes whether the Agreement's status as a Board of Appeals order requires the parties to exhaust administrative remedies prior to seeking recourse in the courts.

In *Josephson v. City of Annapolis,* 353 Md. 667, 728 A.2d 690 (1999), the Court of Appeals reiterated the "general rule":

[W]hen administrative remedies exist ... they must be exhausted before other actions, including requests for declaratory judgments, mandamus and injunctive relief, may be brought.

353 Md. at 681, 728 A.2d at 696. *See also Moose v. Fraternal Order of Police,* 369 Md. 476, 487, 800 A.2d 790, 797 (2002); *Montgomery County v. Broadcast Equities, Inc.,* 360 Md. 438,

452, 758 A.2d 995, 1003 (2000); *Young v. Anne Arundel County*, 146 Md.App. 526, 556, 807 A.2d 651, 669 (2002).

The exhaustion doctrine is grounded, in part, in the prudential concern that a court must allow the executive's jurisdiction in the first instance over a controversy within the executive's expertise. *See State Retirement and Pension System v. Thompson*, 368 Md. 53, 65–66, 792 A.2d 277, 284–85 (2002). The doctrine of "primary jurisdiction," which "coordinate[s] the allocation of functions between courts and administrative bodies[,] . . . is predicated upon policies of judicial restraint[.]" *Maryland–National Capital Park and Planning Commission v. Washington National Arena*, 282 Md. 588, 601, 386 A.2d 1216, 1225–26 (1978) (citations omitted).

But the remedy sought here by the Advisory Board, a mandatory injunction, is purely equitable in nature, and a preeminently judicial function that is not within the expertise of zoning administrators or the Board of Appeals. Appellees have invoked the equity power of the courts to return the Blakehurst property to its *status quo ante*, to wit: the removal of structures that exist in direct contravention of the restrictive covenants. Although administrative bodies may exercise certain quasi-judicial functions, for example, rendering findings of fact and making conclusions of law to decide disputes between parties, *see, e.g., Department of Natural Resources v. Linchester Sand & Gravel Corp.*, 274 Md. 211, 219–21, 334 A.2d 514, 520–21 (1975), the remedy effected *sub judice*—a mandatory injunction—is purely a judicial prerogative. Because the construction of the offending structures was a *fait accompli*, the Advisory Board's sole recourse to effect their removal would be to enlist the aid of the chancellor.[2]

---

**2.** Moreover, the courts may enforce administrative orders in the appropriate case. *See McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 196, 69 S.Ct. 497, 93 L.Ed. 599 (1949). *See generally*, Louis L. Jaffe, *The Judicial Enforcement of Administrative Orders*, 76 HARV. L. REV. 865 (1963). In doing so, it is clear that the chancellor must determine whether such relief is appropriate, and this entails an interpretation of the Agreement in this case, even though it has been incorporated into a consent order of the Board of Appeals.

## II.

■ We review the circuit court's decision to grant an injunction for an abuse of discretion. *See State Commission on Human Relations v. Talbot County Detention Center,* 370 Md. 115, 127, 803 A.2d 527, 534 (2002) (statutory injunction). As to the findings of fact and conclusions of law rendered by the court in a trial without a jury, the Court of Appeals directs:

> Both this Court and the Court of Special Appeals, when reviewing a case tried without a jury, must "review the case on both the law and the evidence." Maryland Rule 8–131(c) (1995 Repl.Vol.). The Court must "not set aside the judgment of the trial court on the evidence unless clearly erroneous," and must "give due regard to the opportunity of the trial court to judge the credibility of the witnesses." *Id.* In addition, we must consider the evidence in the light most favorable to the prevailing party, *e.g., Geo. Bert. Cropper, Inc. v. Wisterco,* 284 Md. 601, 620, 399 A.2d 585[, 595] (1979), and decide not whether the trial judge's conclusions of fact were correct, but only whether they were supported by a preponderance of the evidence. *E.g., State Insurance Comm'r v. Nat'l Bureau,* 248 Md. 292, 305, 236 A.2d 282[, 289] (1967).

*Colandrea v. Wilde Lake Community Association,* 361 Md. 371, 394, 761 A.2d 899, 911 (2000) (quoting *Urban Site Venture II Limited Partnership v. Levering Associates Limited Partnership,* 340 Md. 223, 229–30, 665 A.2d 1062, 1065 (1995)).

■ Again, we review the trial court's findings of fact for clear error in light of the record as a whole, and in the light most favorable to the prevailing party. *See Murphy v. 24th Street Cadillac Corp.,* 353 Md. 480, 497, 727 A.2d 915, 923 (1999). Findings supported by substantial evidence are conclusive. *Id.* at 497, 727 A.2d at 923–24.

## III.

Appellants maintain that the garden shed is a permissible use under Paragraph 2.b of the Agreement, and vigorously

contest the circuit court's finding to the contrary. They point out that the shed is an adjunct to the gardening activities of the Blakehurst residents, which activities are doubtlessly recreational in nature.

Appellants' syllogism reads thus:

1. The residents' gardening has been found to be a recreational activity, and the purpose of the shed is to facilitate that recreational activity.

2. The shed is thus ancillary to the permitted use of the property, and is therefore a permitted use under the Agreement.

3. Accordingly, the circuit court's injunction mandating the shed's dismantling is lawless.

We disagree with appellants' interpretation of the relevant portion of the Agreement. As noted by Judge Sharer for the Court in the companion case, "Maryland has long adhered to the law of objective interpretation of contracts." *Blakehurst,* 146 Md.App. at 523, 807 A.2d at 187 (citing, *inter alia, Auction & Estate Representatives, Inc. v. Ashton,* 354 Md. 333, 340, 731 A.2d 441, 444 (1999)). *See also, County Commissioners of Charles County v. St. Charles Associates Ltd. Partnership,* 366 Md. 426, 444, 784 A.2d 545, 556 (2001). Further, the interpretation of such an accord presents a question of law, which we review *de novo. Calomiris v. Woods,* 353 Md. 425, 447, 727 A.2d 358, 368–69 (1999).

Paragraph 2.b of the Agreement provides in part:

2. *Use and Term Limitation*

b. That portion of the Community, Exhibit A, Parcel B, lying south of the internal roadway and identified as Cemetery Road, *shall remain as open space* and shall be used solely for recreation, golf holes, non-lighted tennis courts or similar recreational activities for the exclusive use of residents of the community and their guests for a period of fifty (50) years from the date of this Agreement. The parties agree that this portion of Parcel B shall not be subdivided and shall be used only in conjunction with the use authorized for the whole of Parcel B during that period. It is

further agreed that there will be no parking permitted, no buildings nor structures nor paving of any sort constructed on that portion of Parcel B or permitted other than is shown on Exhibit A during that period. The parties further agree that there shall be no lighting of any of the activities permitted on this portion of Parcel B. (Emphasis added.)

 In urging that we reverse the circuit court, appellants maintain that the garden shed is explicitly authorized by the Agreement because of its necessary connection with the residents' gardening activities. Citing *Chertkof v. Spector Baltimore Terminal, Inc.*, 263 Md. 550, 284 A.2d 215 (1971), appellants remind us that, just as the fence, I beams, macadam bumpers, truck warmers and the like were viewed as adjuncts to a permitted use in that case so also should we view the garden shed as a necessary, indeed required, part of the recreational gardening activities envisioned by the Agreement for the residents of Blakehurst.[3]

Notwithstanding the inclination in the law toward the unfettered use of one's property in general, the restrictive covenants are meant to be enforced as written. A clear purpose of Paragraph 2.b of this Agreement is to preserve open space. In *Eisenstadt v. Barron,* the Court of Appeals observed:

[Maryland Courts] have frequently stated and applied the rule of strict construction in favor of the unrestricted use of

---

**3.** Appellants trumpet the fact that, without the garden shed for the storage of their tools, the residents would be forced to haul their equipment up an incline to their lodgings in order to secure their tools. We do not denigrate the difficulty of this task for many residents. The circuit court considered this argument in balancing the equities of this case, and evaluating the comparative hardship to each party. But the impact of any hardship that would accrue to Blakehurst is, in our view, greatly minimized where, as here, the chancellor found that the erection of the garden shed was not an innocent mistake, and that Blakehurst avoided the process that had resulted in five addenda to the Agreement. *See generally, Colandrea v. Wilde Lake Community Ass'n, Inc.,* 361 Md. 371, 396–98, 761 A.2d 899, 912–13 (2000) (quoting *Chevy Chase Village v. Jaggers*, 261 Md. 309, 320–21, 275 A.2d 167, 173 (1971); *Grubb v. Guilford Assoc., Inc.,* 228 Md. 135, 140, 178 A.2d 886, 888 (1962) and *Liu v. Dunnigan,* 25 Md.App. 178, 193–94, 333 A.2d 338, 346 (1975)).

property.... But this does not mean that language must be so narrowly construed as to defeat its general purpose. 252 Md. at 368, 250 A.2d at 90 (quoting *Martin v. Weinberg,* 205 Md. 519, 526–27, 109 A.2d 576, 579 (1954)). We think that appellants miss the fact that the overriding matter of Paragraph 2.b of the Agreement is that the portion in question "shall remain as open space[.]" It is this "open space" that "shall be used solely for recreation[.]" The prohibition of "buildings" and "structures" follows the "open space" mandate, as well as the provision for recreation. That permitted activity, recreation, in no way modifies or qualifies the Agreement's clear statement that "no buildings nor structures nor paving" are allowed.[4]

In the final analysis, we conclude that Paragraph 2.b of the Agreement dictates that the portion of the Community at issue must be dedicated to open space, and that any recreational use of that portion shall not be inconsistent therewith. Because the garden shed violates the clear terms of the Agreement, we uphold the circuit court's ruling to that effect. For the reasons set forth below, we also affirm the chancellor's remedy.

## IV.

Appellants' alternative challenge to the circuit court's position on this issue is to contest the validity of the mandatory

---

4. Nor do we agree that the Court's decision in *Chertkof v. Spector Baltimore Terminal, Inc.,* 263 Md. 550, 284 A.2d 215 (1971), dictates the result appellants seek. Although the "I beams, macadam bumpers and motor warmers" in that case were ruled to be "clearly ancillary" to permitted uses, and were not deemed to be "structures" under the restrictive covenant at issue in that case, we do not concur with appellants that the garden shed in the instant case is of the same character as those items from *Chertkof.* We conclude that, on the extant record, the shed, which cost approximately $8,000 to build, was placed on a concrete pad, and is an enclosed building with a peaked, shingled roof, most certainly is a "structure." *See generally Lindner v. Woytowitz,* 37 Md.App. 652, 657, 378 A.2d 212, 216 (1977). *Cf. Eisenstadt v. Barron,* 252 Md. 358, 369, 250 A.2d 85, 91 (1969) (roadway a type of structure). In any event, any "improvement," whether or not deemed to be a "structure," which would conflict with the "open space" requirement, would be disallowed.

injunction. Assuming that the garden shed was constructed in violation of the Agreement, they nevertheless insist that the circuit court's issuance of the mandatory injunction was unlawful because the judge failed to find irreparable harm, and that none could be shown in any event. We do not agree.

### Injunctions Generally

Our Rules of Civil Procedure define "injunction" as an "order mandating or prohibiting a specified act." Md. Rule 15–501. *See Maryland Trust Co. v. Tulip Realty Company of Maryland, Inc.*, 220 Md. 399, 412, 153 A.2d 275, 284 (1959). Judge Harrell, writing on behalf of the Court of Appeals, recently observed:

> An injunction is " 'a writ framed according to the circumstances of the case commanding an act which the court regards as essential to justice, or restraining an act which it esteems contrary to equity and good conscience.' " . . . Thus, injunctive relief is " 'a. preventative and protective remedy, *aimed at future acts,* and is not intended to redress past wrongs.' "

> \* \* \*

> We review the exercise of the trial court's discretion to grant or deny a request for injunctive relief under an "abuse of discretion" standard (*see Colandrea,* 361 Md. at 394, 761 A.2d at 911 (citing *State Dep't of Health & Mental Hygiene v. Baltimore County,* 281 Md. 548, 554, 383 A.2d 51, 55 (1977))); however, we give no such deference when we find "an obvious error in the application of the principles of equity." *Western Md. Dairy v. Chenowith,* 180 Md. 236, 244, 23 A.2d 660, 665 (1942).

*El Bey v. Moorish Science Temple of America, Inc.,* 362 Md. 339, 353–54, 765 A.2d 132, 139–40 (2001). *See also Colandrea,* 361 Md. at 394–95, 761 A.2d at 911. *Cf. Talbot County Detention Center,* 370 Md. at 127, 803 A.2d at 534 (statutory injunction).

We certainly recognize that in general the party seeking injunctive relief has been required to demonstrate "irreparable harm" for the writ to issue, for this requirement has by tradition been a touchstone for granting injunctive relief. The following language from *Moorish Temple* comes to mind:

Injunctive relief normally will not be granted unless the petitioner demonstrates that it will sustain substantial and irreparable injury as a result of the alleged wrongful conduct. *Maryland–Nat'l Capital Park and Planning Comm'n v. Washington Nat'l Arena*, 282 Md. 588, 615, 386 A.2d 1216, 1234 (1978) (citations omitted); *Fort v. Groves*, 29 Md. 188, 193–94 (1868). Such injury, however, need not "be beyond all possibility of compensation in damages, nor need it be very great." *Maryland–Nat'l*, 282 Md. at 615, 386 A.2d at 1234 (quoting *Hart v. Wagner*, 184 Md. 40, 48, 40 A.2d 47, 51 (1944); *Smith v. Shiebeck*, 180 Md. 412, 422, 24 A.2d 795, 801 (1942)). Rather, "irreparable injury is suffered whenever monetary damages are difficult to ascertain or are otherwise inadequate." *Maryland–Nat'l*, 282 Md. at 615, 386 A.2d at 1234 (quoting *Glasco v. Hills*, 558 F.2d 179, 181 (3d Cir.1977)); *see also Dudley v. Hurst*, 67 Md. 44, 52, 8 A. 901, 904 (1887) ("An injury may be said to be irreparable when it cannot be measured by any known pecuniary standard.").

*Moorish Temple*, 362 Md. at 355, 765 A.2d at 140. According to a noted commentator, "[s]ubstantial and positive injury must always be made to appear to the satisfaction of a court of equity before it will grant an injunction[.]" 1 James L. High, LAW OF INJUNCTIONS, § 9 at 14 (4th ed., S.T. High ed., 1905).

### *Restrictive Covenants*

We conclude, however, that this rule does not control where a mandatory injunction is sought to enforce a restrictive covenant, such as that which is embodied in the restrictive covenant Agreement *sub judice*.

"An equitable restriction on land has been held to be a property right in the person in favor of whose estate it runs or

to which it is appurtenant." *Pollack v. Bart*, 202 Md. 172, 176, 95 A.2d 864, 866 (1953). Such covenants, while running with the land, are also in the nature of contracts while being compensable property rights. *Cf. Mercantile–Safe Deposit & Trust Co. v. Mayor and City Council of Baltimore*, 308 Md. 627, 641, 521 A.2d 734, 740 (1987) (stating "majority rule" that restrictive covenants running with the land are compensable property rights for eminent domain purposes). *See also Electro–Nucleonics, Inc. v. Washington Suburban Sanitary Commission*, 315 Md. 361, 367, 554 A.2d 804, 807 (1989).

Equity is often invoked to moderate competing interests in land. A noted commentator on the law of injunctions observed with respect to the writ and its relation to real property, that "[t]he numerous and complicated questions ... connected with [property's] possession and enjoyment[] have given rise to frequent applications for the exercise of the extraordinary aid of equity by injunction." High on Injunctions, § 323 at 315. Again, while the "irreparable harm" requirement is generally an indispensable prerequisite for injunctive relief, "when there is a wilful and unlawful invasion of plaintiff's right, against his protest and remonstrance, the injury being a continuing one, a mandatory injunction may be granted in the first instance." *Id.* § 2 at 5.

It is instructive to compare the remedies of specific performance and injunction, because in certain circumstances, such as the enforcement of the terms of the Agreement in this case, the requirements for both avenues of relief are the same. Specific performance may be granted in the appropriate case on the basis of the strength of the circumstances and equities of each party. *See Zouck v. Zouck*, 204 Md. 285, 296, 104 A.2d 573, 577 (1954); *Barranco v. Kostens*, 189 Md. 94, 97, 54 A.2d 326, 328 (1947). It does not by necessity require the showing of irreparable injury. Judge Levine's discussion for the Court on the remedies of specific performance and injunction in *Maryland–National Capital Park and Planning Commission* merits our attention:

While the trial court has discretion to grant or deny specific performance in any given case, specific performance will usually be decreed, as a matter of course, where the contract is in its nature and circumstances unobjectionable, that is, fair, reasonable and certain in all its terms. *Hupp v. George R. Rembold Bldg. Co.*, 279 Md. 597, 600–601, 369 A.2d 1048 (1977). *Gross v. J & L Camping & Sports*, 270 Md. 539, 543–44, 312 A.2d 270 (1973). On the other hand, injunctive relief will not normally issue unless the complainant demonstrates that he sustained substantial and irreparable injury as a result of the wrongful conduct. *Salisbury v. Camden Sewer Co.*, 135 Md. 563, 572, 109 A. 333 (1920).

282 Md. at 615, 386 A.2d at 1233–34 (footnote omitted). But as pointed out by the Court of Appeals in *Colandrea:*

Generally, covenants affecting property are, even when running with the land, nonetheless contractual in nature. A suit to enforce them is *in the nature of specific performance*. We have stated that "[w]here specific performance is proper, equity may accomplish the same result permanently or temporarily by the use of injunction." *Lissau v. Smith*, 215 Md. 538, 548, 138 A.2d 381, 387 (1958) (citing *Smith v. Meyers*, 130 Md. 64, 99 A. 938 (1917)).

*Colandrea*, 361 Md. at 395–96, 761 A.2d at 912 (emphasis added).

In *Eisenstadt*, 252 Md. 358, 250 A.2d 85, a property grantor sued to enjoin the use by one Eisenstadt, the grantee, of his property for other than residential use, and to enjoin the use of a water pipe that Eisenstadt had constructed, both uses alleged to be in violation of deed restrictions. Despite the covenants in the deed, Eisenstadt constructed a driveway through his property to service an adjoining parcel that was not subject to the restrictions, where he was developing apartments. He also constructed the water line that exceeded the capacity permitted by the covenants.

The chancellor enjoined the roadway, and also issued a prohibitory injunction against the use of the existing water

pipeline. In a related action, he held Eisenstadt in contempt for a violation of the pipeline restriction.

The Court of Appeals upheld the injunction against the driveway, and also agreed that the waterline was in violation of the restrictions. The contempt citation was struck down on lack of notice grounds.

For our purposes, the court's analysis of the chancellor's injunction against the water line is instructive. He determined that the water line had been set down in defiance of restrictions. According to the Court of Appeals:

... Eisenstadt knew of the water line restriction. He accepted the deed. We must conclude he knew what was in the deed. The restriction is clear and unambiguous. It is a valid restriction for the protection of certain of the other lots in the subdivision, seven of which were owned by Barron. Eisenstadt has other means of acquiring water. There is no merit in his contention that the injunction is contrary to public policy in that by indirection it unreasonably limits the right of a public utility to extend its services. It is not directed to a municipality or public utility which is seeking to extend its services. It is intended to be an injunction of a trial court enjoining Eisenstadt from breaking a covenant in his deed from his grantor regarding a restriction as to the use of his land.

It is impossible to construe a one inch restriction as permitting an eight inch connection.

There was no error on the part of the chancellor as to this injunction *except that it should have required the removal of the pipe as hereinafter noted.*

*Eisenstadt,* 252 Md. at 371, 250 A.2d at 92 (emphasis added). The Court of Appeals thus directed the chancellor on remand to issue a mandatory injunction. No finding of irreparable harm was required. *Id.,* 252 Md. at 373, 250 A.2d at 93.

We also briefly note that the chancellor's view of the breach of the restrictions in *Eisenstadt* mirrors to some extent the circuit court's observation that the construction of the garden shed was an intentional act, as well as his wonder why

Chestnut would circumvent the established custom of the parties to resolve disputes under the Agreement by submitting amendments.

In this instance, Judge Cahill found with respect to the garden shed, that:

> I don't find that this shed was an innocent mistake on the part of the ownership, and so I will grant relief to the Plaintiff [Advisory Board and certain members, appellees here] as regards the equipment shed, and direct that it be removed[.]

Finally, "where the act complained of is such that by its repetition or continuance it may become the foundation of adverse rights, equity may interfere by injunction, although no actual or substantive injury be shown." High on Injunctions, § 9 at 14. This view is similarly articulated by John Norton Pomeroy, who in his learned treatise recites:

> The injunction in this class of cases is granted almost as a matter of course upon breach of the covenant. The amount of damages, and even the fact that the plaintiff has sustained *any* pecuniary damages, are wholly immaterial. . . .
>
> "It is clearly established by authority that there is sufficient to justify the court interfering, if there has been a breach of the covenant. . . . The moment the court finds that there has been a breach of the covenant, that is an injury, and the court has no right to measure it, and no right to refuse to the plaintiff the specific performance of his contract, although his remedy is . . . an injunction."

4 J.N. Pomeroy, EQUITY JURISPRUDENCE, § 1342 at 942–43 (5th ed., Spencer W. Symons ed., 1941) (quoting *Leech v. Schweder*, L.R. 9 Ch.App. 463, 465, note, 468, note).

There is considerable authority from other jurisdictions to support the proposition that injunctive relief will obtain to remedy a violation of a restrictive covenant absent a showing of irreparable harm. As was observed by a Florida appellate court:

> It is well established in this jurisdiction that even in the absence of a showing of irreparable injury injunctive relief

is grantable as a matter of right, subject only to sound judicial discretion, to restrain the violation of a restrictive covenant affecting real estate. *Stephl v. Moore*, 94 Fla. 313, 114 So. 455 (1927). It is the theory of the law that every piece of land has a peculiar value, infringement of which is not readily remedial by assessment of damages of law. *Cf.* 29 Fla.Jur., page 555. And where the facts are clear and undisputed, the court by means of a mandatory injunction may compel the undoing of a thing already done in violation of such covenants.

*Coffman v. James*, 177 So.2d 25, 31 (Fla. 1st DCA 1965). In *Buie v. High Point Associates Ltd. Partnership*, 119 N.C.App. 155, 458 S.E.2d 212, *disc. rev. denied*, 341 N.C. 419, 461 S.E.2d 755 (1995), the North Carolina Court of Appeals observed that, "[w]hen enforcing a restrictive covenant and restoring the status quo, a mandatory injunction is the proper remedy." *Id.* at 160, 458 S.E.2d at 216. The Connecticut Supreme Court, in *Gino's Pizza of East Hartford, Inc. v. Kaplan*, 193 Conn. 135, 139, 475 A.2d 305, 307 (1984), proclaimed that, "[w]hen presented with a violation of a restrictive covenant, the court is obligated to enforce the covenant unless the defendant can show that enforcement would be inequitable." An earlier decision from that court also addresses the same issue that appellants bring before us today, and its discussion merits some notice:

> The defendant claims that HELCO is not entitled to an injunction without a showing that it is threatened by a substantial and irreparable injury. There is a long line of authority supporting the proposition that, as a general rule, irreparable and substantial injury must threaten before an injunction is warranted.... These and many other similar cases have been examined, and in none of them was an injunction which was sought to enforce a restrictive covenant refused for the lack of a threat of substantial irreparable injury. Cases involving enforcement of restrictive covenants show that in those actions a different standard is applied to the request for an injunction.

*Hartford Electric Light Co. v. Levitz,* 173 Conn. 15, 19–20, 376 A.2d 381, 384 (1977) (citations omitted). *See also Blue Reef Holding Corp., Inc. v. Coyne,* 645 So.2d 1053, 1055 (Fla. 4th DCA 1994).

We believe it clear, then, that in the case of the violation of a restrictive covenant, injunctive relief would issue with no greater showing than is required to obtain specific performance, with no requirement that irreparable injury be shown. Appellants' reliance on the decision of this Court in *Anne Arundel County v. Whitehall Venture,* 39 Md.App. 197, 384 A.2d 780 (1978), is misplaced. The Circuit Court for Anne Arundel County had issued a mandatory injunction, preventing the county and its Board of Public Works from constructing a certain sewer main and directing them to remove a similar line that had already been constructed. This Court reversed the chancellor, lifted the injunction and remanded for other proceedings. Judge Couch said for the Court:

> Our review of the chancellor's exercise of his discretion in granting the mandatory injunction, in light of the principles set out above, and within the confines of Maryland Rule 1086, leads us to the conclusion that because appellees possessed no cognizable *right* that had been denied or adversely affected, the chancellor abused his discretion.

*Whitehall Venture,* 39 Md.App. at 201, 384 A.2d at 784 (emphasis in original). In contrast, here the appellees, the Advisory Board in the case *sub judice,* do have a "cognizable right that [has] been ... adversely affected": their rights under the restrictive covenant Agreement. We believe that *Whitehall Venture* is clearly inapposite.

At the end of the day, we discern no abuse of the chancellor's considerable discretion in fashioning the remedy of a mandatory injunction. Accordingly, we shall affirm the circuit court's entry of a mandatory injunction.

## IV.

We turn to appellants' assertion that the circuit court erred in ruling that Blakehurst was not authorized to create additional parking spaces without obtaining the approval of the

Advisory Board. They insist that the proposed changes in the Blakehurst parking could have been accomplished without yet another amendment to the Agreement, and challenge Judge Cahill's interpretation of Paragraph 1.f.[5]

In advancing this issue, the parties did not have the benefit of this Court's decision in *Blakehurst I*. Judge Sharer's lucid treatment of this issue for this Court governs our resolution of this question:

> The Board [of Appeals] was correct that no other agency or official could amend the terms and conditions of its 1988 consent order, and the incorporated Agreement, without the [Advisory Board's] written approval by way of addendum, or by a petition for special hearing to request that the Board modify the conditions and terms of the consent order and the Agreement.

*Blakehurst I*, 146 Md.App. at 524, 807 A.2d at 188.

▆▆▆ On the basis of collateral estoppel, the above disposition in *Blakehurst I* precludes any further inquiry into this issue. In *Murray International v. Graham*, 315 Md. 543, 555 A.2d 502 (1989), the Court of Appeals articulated the doctrine of collateral estoppel to be "[w]hen an issue of fact *or law* is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim." *Id.*, 315 Md. at 547, 555 A.2d at 504 (emphasis added) (quoting RESTATEMENT (SECOND) OF JUDGMENTS, § 27 (1982)).[6]

---

5. Paragraph 1.f reads:

 Reasonable adjustments in the location of buildings, parking and other features of the Community shall be permitted upon the direction and approval of the Director of Planning for Baltimore County, it being the intention of all parties to maximize the retention of existing trees and vegetation on the Land and to permit a degree of flexibility in addressing the nature and constraints of the site, appropriate governmental building standards and requirements and the needs of the elderly residents.

6. Collateral estoppel or issue preclusion involves not only the preclusive effect of the disposition of issues of fact, but also questions of law. *See* RESTATEMENT (SECOND) OF JUDGMENTS § 27.

*See Colandrea,* 361 Md. at 387–91, 761 A.2d at 907–09 (discussing collateral estoppel and *res judicata* ). *See also Batson v. Shiflett,* 325 Md. 684, 702, 602 A.2d 1191, 1200 (1992) (preclusive effect of administrative decisions rendered in course of quasi-judicial proceedings).

Accordingly, whether styled as a "refinement" [7] to the Agreement or an overall change in the character of the property, such changes as were attempted by Chestnut in this case were subject to the formal procedures rehearsed in the above passage by Judge Sharer. Because Chestnut did not pursue those procedures, the chancellor was authorized to remedy the effects of Chestnut's actions by such relief as was appropriate, including the remedy of a mandatory injunction.

## V.

Appellants last address the issue of the circuit court's award of attorneys' fees pursuant to Paragraph 18 of the Agreement. That paragraph provides in part that:

> If any party to this Agreement, or any party's successor, is required to institute legal action to enforce the terms of this Agreement, and is successful thereafter (whether by judgment or settlement) in obtaining enforcement of the Agreement, that party or successor shall be entitled to recover reasonable attorneys' fees and court costs of the action from

---

7. Appellants urged at oral argument the importance of the "refinement" issue, and their argument suggests that, regardless of this Court's treatment of the appeal in *Blakehurst I,* the Board of Appeals's determination that its proposed parking lot plan constituted a "refinement" had not been appealed, and it could thus pursue its parking expansion without resort to the formal addendum process. We believe that this is precluded by our opinion in *Blakehurst I.* We note as well that a majority of the Board of Appeals, despite its "refinement" finding, nevertheless stated:

> If this were simply a case which involved the issue of "refinement" versus "material amendment," the Board would not have any difficulty with it. However, what makes this case substantially different is the fact that there is a restrictive covenant agreement that was entered into by the parties.

*In the Matter of Blakehurst Life Care Community,* Nos. CBA–99–152, CBA–99–159, at 11 (Nov. 15, 2000) (majority opinion).

the person or entity against whom the enforcement is obtained.

Appellants do not quarrel with the terms of this provision, and its application in the appropriate case. In view of our disposition of this appeal, we shall affirm the award of attorneys' fees made pursuant to Paragraph 18, and remand to the circuit court to render findings as to appellees' entitlement to reasonable attorneys' fees incurred with respect to the proceedings on appeal, and enter an appropriate Order in accordance therewith. *See* Md. Rule 8–604(d)(1).

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED. CASE REMANDED TO THAT COURT TO RENDER FINDINGS AND CONCLUSIONS WITH RESPECT TO ATTORNEYS' FEES.**

**COSTS TO BE PAID BY APPELLANTS.**